The first case this morning is Ecolab v. FMC. Mr. Hanlon. Good morning, Your Honor. I will first address why Ecolab is entitled to a judgment as a matter of law of non-infringement, and then I reserve the remainder of my time to respond to FMC's arguments. The District Court erred in failing to construe FMC's patent claims to cover only compositions where parasitic acid is the sole antimicrobial agent. Ecolab's accused product Inspex, which is used in beef and chicken processing plants to kill bacteria, has three antimicrobials, parasitic acid, peroctinoic acid, and octanoic acid. During the prosecution of FMC's… Mr. Hanlon, I guess you're arguing that the issue is one of prosecution history estoppel. Or prosecution history disclaimer. Right. How specific does it have to be? Well, I think in this case it's very specific because during the prosecution, FMC distinguished Ecolab's Oaks patent, which was prior art, and the Oaks patent contained the very same mixtures. But the examiner corrects that and then it all goes off in a different direction. Wouldn't anyone reading the record recognize, well, there's been a correction? There's no disclaimer here. They've accepted the correction of the examiner. Well, two responses. First of all, I think all the examiner did was correct FMC's use of the term consisting essentially of. I mean, basically he said… But it's directly relevant to this point. Correct. Correct. But I think the court should understand that the record shows that after the examiner's statement, FMC went on to say later on that there is no prior art showing that parasitic acid has been used to sanitize… I'm having the same problem Judge Rader said. I see the clear statement by the applicant before the examiner's statement. I see the examiner correcting that and I don't see after the examiner's correction any statement in the prosecution history where this solely interpretation is reiterated. Can you show me any? Oh, I think so. Yes. We've identified a number of statements… I've read the statements. They don't say that. Which statement reiterates the solely interpretation? What's your best statement? Well, my best statement is that, and this is on page 9831 of the appendix. 9831. Where FMC states there's no prior art reference teaching or suggesting contacting foul directly with parasitic acid. But it doesn't say, it doesn't repeat the solely interpretation. No, but it only uses parasitic acid. It doesn't reference anything else. Moreover, this court's precedent is very clear in that the examiner's remarks make no difference as to disclaimers. An express disclaimer here is going to be effective and the examiner's remarks do not negate that. That's the springs window fashion case. And so I think that… In springs window fashion? No, no. In the prosecution of the FMC patent. Well, I think there are a number of disclaimers which we've listed. I don't think there's just one. We talk about clear and unmistakable is the way that it has to be disclaimed. When you've got this correction intervening, which as Judge Dyke and I seem to see is not then negated in any way, how could we find a clear and unmistakable? Well, I think the other point that the court should consider is that the examiner allowed the claims over Greenlee. And at first, the examiner rejected the claims over Greenlee because Greenlee was a mixture. But then after there was a discussion with the patentee, it became clear to the examiner that the invention in the FMC patent was simply one consisting solely of parasitic acid. Well, you're speculating about that. There could have been other reasons that he allowed. There could have been other reasons. But certainly, Greenlee was prior art that the examiner relied on. And then they withdrew it. So I think that based on that as well as the court's precedent. I mean, Springs Window fashion is pretty clear. A party may not state during prosecution that claims do not cover a particular device and then later sue a party for infringement who makes that same device. In Springs Window, the applicant continued to maintain that position after the examiner's comments, right? Correct. Not true here. Well, Your Honor, I think that it is true. And I also think that in this specification, it's very clear. It says the parasitic acid, not hydrogen peroxide, is required for the sanitization process. Then there are six examples. Each one of those examples include only parasitic acid as the antimicrobial. I think when you look at both the prosecution history as well as the examples in the specification, it becomes clear that parasitic acid is the sole antimicrobial agent. And I think Ecolab had a right to rely on those statements. What about someone, a competitor, reading that particular aspect of the prosecution history? Do you think that they would get that same concept, that they would be restricted to that? I think that's exactly what Ecolab thought here. I think that's exactly right. Again, because I don't think there was any mention of any other antimicrobials in the prosecution history other than parasitic acid. That is it. And when you take that along with the specification, it seems clear that that's the only antimicrobial that is critical to the invention. So it would be restricted to that parasitic acid then? It would be restricted to parasitic acid. And someone reading the patent application itself and the prosecution history would get that same? I believe that any reasonable competitor looking at this prosecution history as well as the specification would conclude that parasitic acid was the sole antimicrobial agent. Yes. The only other point I wanted to make was that FMC has not appealed the verdict that its product infringes Ecolab's patents, and FMC concedes that Ecolab is entitled to a permanent injunction if the verdict of infringement is affirmed. And I'll sit down. Thank you, Mr. Hamlin. Mr. Hutz? If it pleases the court, going first to the consisting essentially of argument, I think your honors have made the points that I had intended to make. There certainly was an original representation. But do the other additions that Ecolab makes to its product materially affect the claimed invention, the properties? No, your honor. Where does the record show that? Well, your honor, that was an issue, a disputed issue at the trial, because with the construction given by the court, Ecolab argued that these additional antimicrobials that they say were in their product, besides parasitic acid, did make a material difference. And the jury specifically rejected that when finding infringement giving the normal construction to consisting essentially of. And that has not been appealed by Ecolab. So the issue that they've appealed is the claims construction of consisting essentially of, based upon the clear and unmistakable disavowal which they claim existed. And our position is essentially what your honors mentioned. There was an initial statement, an erroneous as a matter of law statement by the prosecuting attorney. The examiner immediately, clearly, and unmistakably on the record said that that was wrong. In fact, what the examiner said is in response to that contention that consisting essentially of meant sole antimicrobial being parasitic acid, the examiner said, quote, in response to this contention of applicants, it should be noted that the terminology consisting essentially does not mean that applicant sanitizing solution is consisted solely of a parasitic acid solution. That's at appendix A9816. So the examiner immediately said, no, no, that's not what your claims mean. And the other significant thing in that quote is the fact that what the examiner basically said is the current interpretation that is being sought by Ecolab is wrong. Because the examiner specifically said, no, the claim is not limited to parasitic acid as the sole antimicrobial. And after that initial erroneous statement and correction by the examiner, the applicant proceeded to acquiesce in that and continued the arguments on entirely different grounds. Did not, for example, amend the claims to include consisting of, which he could have done if he intended to do what Ecolab said, and then went on to distinguish over the prior art based on, in the case of Greenlee, which was mentioned by counsel for Ecolab, by pointing to the minimum amount of parasitic acid required in the solution and then argued that the prior art did not teach direct application to meat without harming it, which, of course, was a limitation in the claim. So there was an initial illegal erroneous argument immediately corrected by the patent examiner, agreed to by the applicant, never again repeated, and we do not believe that any competitor looking at the entire prosecution history, as opposed to simply the scraps that have been referred to, the one-time event by Ecolab, would not believe that this was a solution. Is it the argument being made in order to object to the patent reference OAKS? OAKS was one of them, yes, but OAKS was distinguished on the grounds that OAKS doesn't relate to direct application of parasitic acid to meat and does not teach that if you applied parasitic acid to meat, you would not only be able to sanitize it, but you would be able to do so without an adverse impact on the so-called organoleptic qualities of the meat, the taste, the texture, and so forth. But the addition was more than just parasitic acid that was added there, wasn't it? In OAKS, yes. There was more than one aspect to it. Correct, but OAKS and the specific argument with regard to OAKS after the correction by the examiner had to do with no harm to the meat by the parasitic acid being applied directly to meat, which OAKS did not do. That's what the subsequent prosecution turned on. Is there error in the judge declining to construe consisting essentially of? No, Your Honor. I don't believe so because he construed it in the manner that consisting essentially of is always construed and determined there was no dedication or no clear unmistakable disclaimer and, therefore, consisting essentially of had the same meaning as it always has in all the textbooks. Are you going to address the anticipation? Yes, Your Honor. With regard to the 792 Claim 7, we believe that that is anticipated by the Labadee article. And I think a single sentence in the summary of Labadee at 8614 really sums up the anticipation. 729, right? You said 792. I'm sorry, 792. 729. Well, and I have it wrong in my notes. I apologize, Your Honor. It is indeed 729, and my notes are wrong. Thank you for the correction. But Labadee specifically says, and I quote, after immersion in a 3% solution of peracetic acid for two minutes, the surfaces of muscles obtained from pig, horse, and cattle were shown to be completely decontaminated. That's a full anticipation of Claim 7 because, as we know, peracetic acid has acetic acid in it in addition to peracetic acid, and therefore it meets that minimum limitation of two parts per million peracetic acid and at least 20 parts per million acetic acid. So that one sentence, as Ecolab chose to draft the claims, is a full anticipation of every feature of the claim. If you assume, of course, that the court properly construed the 729 patent, Claim 7, to exclude poultry, but even with that exclusion, Labadee specifically teaches every aspect of the claim because, as Ecolab chose to draft the claim, there's no maximum parts per million peracetic acid. It doesn't require no harm to the meat. It doesn't preclude trimming away the meat after treatment, and it doesn't require it to be an edible meat or for meat purposes. And there's an argument by Ecolab that Labadee has to cut away the meat in order to make it sterile. That's not true. There's at least three or four specific instances where Labadee talks about how the surfaces are completely decontaminated, talks about decontamination of muscle surfaces, and talks about superficial decontamination. So you would expect that in any event because peracetic acid was known to be a very powerful antimicrobial. Turning over to the 729 Claim 7, in this instance, obvious over the prior art, if we accept the interpretation by the district court that poultry is excluded from Claim 7, then all we really have, by way of differing over FMC's own 672 patent, is the application of the process that was taught in 676 for poultry to beef. We have reducing the same problem microorganisms or bacterium. We have the same process that is dipping or spraying being used. We have the same antimicrobial being used. We get the same predictable result. There's nothing unexpected here, and it was very commonplace to apply antimicrobials, the same antimicrobials, to both poultry and to beef. Now what about the 963? The 963, Your Honor, there are two aspects of 963. In terms of patentability, or I'd better state it, unpatentability, we believe that the 963 patent is obvious over the 676, the FMC patent, because the sole difference over that is this 50 PSI limitation. The 676 patent teaches spraying the antimicrobial onto the poultry. It teaches, indeed, rapid spraying. So from that standpoint, it does necessarily have a PSI or a pressure associated with that because it wouldn't leave the spray nozzle. So what you have is the 676 patent teaching spraying at any suitable pressure, and what you have is the 963 claims 25 to 28, spraying at any suitable pressure with a minimum of over 50 PSI. That 963 patent's advantages to spraying at a higher pressure, according to the patent itself, is for a mechanical action and for better contact with the surfaces. The 676 patent teaches that peracetic acid is a contact herbicide, and therefore you have to ensure good contact. And if you look at the prior art patents that we have cited, you will see that those precise same advantages for higher spray pressures are taught in the prior art for a wide variety of antimicrobials, not dependent on specific antimicrobials. So that what you have is the sole difference being higher pressure within an even broader range, and you have it for the very advantages that were known in the prior art. Mr. Hutch, wasn't that a jury finding of obviousness as to the factual determination? It is, Your Honor, but it must be reviewed by this court, among other things, as a matter of law in accordance with aggregate law. Only as to the legal conclusion, not the underlying facts, which were found by the jury. That is true, but the companion jury determination regarding the 286 patent for very same, almost identical claims, indeed a species within the genus of the 963 patent, the jury concluded there that there was invalidity for obviousness, and that's not appealed. Those are inconsistent verdicts, though, right? Well, I don't know if they're inconsistent. They certainly are a situation where because there is no appeal by Ecolab, you have a final decision that a species now within the genus of the 963 is obvious, and necessarily, therefore, the genus is too. I think that's a tough argument. The real question is whether there was evidence to support the jury verdict. Factual evidence. Well, I agree with that aspect of it, Your Honor, and we have specifically addressed that in our briefing and shown that the sole difference is this 50 PSI spray, that it is being used in the claims that are at issue, the 963 claims 25 to 28. Were there secondary considerations? There were some that were argued. We would submit there was no nexus, and we would submit that in any event there is such a strong prioritization. All of that being factual, right? That is factual, yes, Your Honor, but we don't know what the jury did with that, but here, as a matter of law, if we look at the AgriGrip and we look at the duty auction cases and we look at leapfrog as examples, the court specifically held that with a very strong prima facie obviousness, the secondary considerations, even if proven, were not sufficient to overcome that prima facie obviousness. So we believe that the court should have granted the JMOLs. The only other thing I'd like to mention, if time permits, is the muscle meat interpretation by the court. The court originally got it right in its interpretation, but then it interpreted muscle meat as muscle from animals but excluding poultry. We think if you look at the 963 patent at column 3, lines 66, to column 4, lines 24, and at column 13, lines 52 to 62, it's very clear that muscle meat was not intended to exclude any species of animal. That only relates to claim 7, right? It relates to claim 7, but the important thing is that if the court's interpretation is wrong, then the Kirshner or the 676 patent anticipates that claim. Claim 7. Right, because then it would include poultry, which, of course, is what the 676 patent teaches. So we believe the court's interpretation was wrong, that muscle meat distinguishes between muscle meat and blood and fat and fluids. It doesn't distinguish between species. If you look at the 693, and we've appealed the claim interpretation in both the 693 and claim 7 of the 729, and 963 is a CIP, and it should be looked to to interpret the meaning in the 792. So we believe that the court was wrong in that regard. You're into your rebuttals. Yes, I will. Thank you. Thank you very much. Mr. Hamlin, you have seven and a half minutes remaining. Thank you, Your Honor. A couple of points on the prosecution history disclaimer argument. First of all, in the prosecution history, after the examiner's statement, the applicant stated very clearly, and this is a quote, applicants claim the use of a parasitic acid that is suitable for sanitizing fowl without adversely affecting the fowl. I mean, it is a very clear statement about what they are claiming. It doesn't say solely. It doesn't use the word solely, but it certainly doesn't indicate that there's any other acid either. And then as to the oaks distinction, the oaks distinction in the prosecution history was this. FMC said oaks appears to be strongly advocating and teaching the use of mixtures of biocides, not the use of a single biocide. It wasn't its effect on poultry. It was the fact that it was a mixture, not a single biocide. I'd like to turn to Labadie first. I'm having difficulty seeing why Labadie doesn't anticipate claim seven. It seems to have disclosed everything and then added this additional step of cutting off the meat. Well, let's start with the claim. The claim discloses a method of applying to said carcass an antimicrobial composition in an amount in time sufficient to reduce the microbial population. Labadie doesn't teach the direct application of parasitic acid to beef to reduce microbial population. It doesn't? No. Labadie, in fact, points out a very elaborate method of decontamination. The meat is placed in a bath of parasitic acid. Then the beef is drawn inside. An isolator is wiped, and the portion of the beef... It has these additional steps in it. Pardon? It has additional steps in it, but the first step is applying the parasitic acid, and it discloses that that eliminates the microbial population. In fact, the article itself does not disclose that there was any reduction as a result of the parasitic acid itself, and both experts, both FMC's expert and Ecolab's expert, agreed that there was no evidence that parasitic acid alone reduced the microbial population. In fact, both agreed that trimming, as well as isolation in the various sterile locks... Wouldn't that be inherent? Pardon? Wouldn't that be inherent? Absolutely not, because there was nothing in the... You add an acid, it's not going to kill organisms? No, and in fact, there was evidence at trial, a lot of evidence, that both Ecolab and FMC applied parasitic acid to meat, and it didn't work. So it is not inherent, and it wasn't inherent at the time, certainly not at the time of the filing of Ecolab's patents. So there is nothing inherent about it. But in fact, what they did in this first step would have reduced the microbial population, right? In fact. No, I mean, there's absolutely nothing in Labaday, and the experts agreed that there was nothing in Labaday showing that that first step did anything. No, no, but what Judge Rader was asking about was inherency. It was inherent. Necessarily, you put the acid on, it kills the germs. And my point is, there was evidence at trial from both experts, and from Ecolab and FMC, stating that when they tried to apply parasitic acid to meat, it didn't have any effect. So it can't be inherent. But by didn't have any effect, what do you mean? It didn't kill any germs? It did not kill any germs. I mean, that was the evidence. There was no reduction in the population, right, at that point? Pardon your honor? There was no reduction in the microbial population. There was no reduction in the microbial population. I mean, FMC's, I think it was his... What does their expert say, then? What page? As far as... That applying parasitic acid doesn't reduce the microbial population. Well, FMC's expert basically, in his writings, over and over again, says a number of things. That essentially, he uses different antimicrobials and gets different results. Well, is there some page in here where somebody says, I looked at the Labadee article, we've done what was described in the Labadee article, and it didn't reduce the microbial population? No, neither expert tried to replicate the Labadee article. But both of them said, and here's what Ecolab's expert said. Where are you reading? I'm reading from the appendix, page 5778. Ecolab's expert stated that the portions of the meat exposed to parasitic acid are cut off and removed, leaving only a sterile center portion that can be used for testing. FMC's expert testified... What does that have to do with what we're talking about? Well, what we're talking about is whether the first step reduced the microbial population. Right. Not whether they had another step where the meat was cut. Well, both experts also agreed that only after the meat exposed to parasitic acid was cut away was an analysis done to determine if there had been any reduction at all in the bacteria. And that's at page 6072. That doesn't address the inherency question. Well, again, I think that you have to look at the prior art, you have to look at what was out there, and there's absolutely no evidence. In fact, the evidence goes the other way, that parasitic acid does not always reduce microbial populations. But, of course, inherency assumes that there is nothing written to disclose it. It says that it necessarily must be so regardless of what is disclosed. Right. And I think inherency can also be contradicted by the experimentation and the evidence of... Well, of course, if there are facts to the contrary, but we've asked you, where are those facts? Let's say you add the acid, it doesn't kill the germs. Sure. Basically, we've got eco-labs, experiments, they're scientists spraying parasitic acid on beef, using parameters developed for organic acids, they get a null result. And the same thing happened with FMC's attempts to spray parasitic acid on beef. The testimony was they got a null result. The patent doesn't work, right? No. The point is that it takes experimentation. It takes experimentation. Experimentation to do what? To reduce the parasitic acid. Excuse me, to reduce the bacteria with parasitic acid. Experimentation to do what? Essentially to find the time, the temperature, and to get the kinds of parameters. What does the jury verdict have on anticipation, a question of fact? Well, this court reviews sufficiency of the evidence to support the verdict of no anticipation. A reasonable jury could not conclude that FMC had met its burden of clear and convincing evidence here, based on Labaday, because of the various distinctions between Labaday's method and eco-labs' methods. Both experts agreed that the Labaday method included the trimming. Both experts agreed that there was no testing of the beef that was actually removed that was exposed to parasitic acid to see whether there was a microbial reduction. And so based on that evidence, the jury concluded there was no anticipation. Final comments? Yes. Just again, I think the court needs to keep in mind that there was a lot of evidence from FMC's own expert. His writings that antimicrobials are neither interchangeable nor predictable. And the jury, just on the basis of his writings, could have reached the verdicts of no obviousness and no anticipation. Thank you. Mr. Hamill, Mr. Hutz? Thank you, Your Honor. Just a brief comment on Labaday. First of all, the claim that we're looking at only requires reduction. It doesn't have an amount of reduction. There's no amount. Second of all, we know before Labaday that parasitic acid is a very highly active antimicrobial. We know that in Labaday you're using 30,000 parts per million of parasitic acid. We know parasitic acid works as little at 100 parts per million. So you're way above. One skill in the art would certainly understand when Labaday specifically said several times that the surfaces are completely decontaminated by parasitic acid. There's superficial decontamination, decontamination of muscle surfaces. You don't need to test for that. The only reason they trimmed was not for sterility but to remove a small amount, surface amount, of the meat that was denatured by the very high amount of parasitic acid. But to suggest that there was no reduction in a microbial population is just plain wrong. But in Labaday there was never any final test to determine that, was there? There was no final test. There was a final test of the ultimate product, yes. To determine whether or not there was a reduction in the population of microbes. They proved there was no population whatsoever. That was the whole purpose of it. So whatever was there was gone. You'd have to assume there wasn't any, in which case you didn't need Labaday. So the point of the fact is that Labaday was reducing microbial population to zero. It does have a trimming step. But a trimming step is not excluded by the claim that we're looking at. But do you agree that you have to rely on adherency here because of the absence of any testing before they cut away the meat? I would say no, Your Honor, because number one, the reference expressly says you get superficial decontamination. It doesn't say you only do it with the trimming step. And the trimming step is not... What's the statement based on that it results in superficial decontamination? Superficial meaning at the surface. Yes. And there are several. That's the process that Labaday utilizes and the tests that Labaday ran. They didn't run any tests before they cut the meat. They did not run tests before they cut the meat. But the cutting away of the meat was to remove the denaturing, and that's not prevented by the language of the claim. So to me, to suggest that at 30,000 parts per million, you're not going to get a reduction of microbes. When you know that peracetic acid is effective as low as 100 parts per million, it just doesn't make logical sense. But that's still an adherency type of an argument, isn't it? Your Honor, I would submit it's not really adherency because of the fact there's no limitation in the claim that excludes, as it is literally written, and it is literally written as treating the surfaces and decontaminating the surfaces. So I would submit that those statements in and of themselves are anticipation. Thank you very much. Thank you.